13 CV 1175

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MAREK VASUT, derivatively on behalf of KIT DIGITAL, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | **VERIFIED SHAREHOLDER** |
| | ) | **DERIVATIVE COMPLAINT** |
| KALEIL ISAZA TUZMAN, ROBIN SMYTH, | ) | |
| GAVIN CAMPION, CHRISTOPHER | ) | **DEMAND FOR JURY TRIAL** |
| WILLIAMS, DANIEL W. HART, LARS | ) | |
| KROJIER, JOSEPH E. MULLIN III, SANTO | ) | |
| POLITI, WAYNE WALKER, | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KIT DIGITAL, INC., | ) | |
| | ) | |
| Nominal | ) | |
| Defendant. | ) | |

FEB 21 2013
U.S.
CASHIERS

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Marek Vasut ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of Nominal Defendant KIT digital Inc. ("KIT" or the "Company") against certain current and/or former members of its Board of Directors (the "Board"), seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from November 8, 2011 to November 21, 2012 (the "Relevant Period"). Plaintiff alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief based upon his attorneys' investigation, which included, but was not limited to a review of United States

Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company.

## I.  NATURE OF THE ACTION

1.      KIT is a company that makes end-to-end video asset management software and related services to enterprise clients. During the Relevant Period, the Company issued false and misleading statements in its public filings, press releases, and conference calls that failed to disclose (a) that the Company was not achieving the growth in earnings or revenues that it claimed because it overstated the effectiveness of integrating acquired corporations; (b) that the Company overstated its growth and profitability; (c) that the Company falsely represented it had implemented adequate accounting systems that were capable of producing true, accurate, and reliable financial statements; and (d) that in light of these factors, the Company did not have any reasonable basis to claim that it was operating according to plan or could realistically achieve its projections.

2.      Meanwhile, the Board knew and had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements being issued during the Relevant Period were materially false and/or misleading. Notwithstanding the above, the members of the Board consciously disregarded their duty of oversight and their duty to ensure that a reasonable reporting system was in place, but rather allowed the Company to issue the materially false and misleading statements. When the truth about the Company was revealed, KIT shares declined 27% in one day and investors filed a securities fraud class action against the Company.

3.      On November 21, 2012, the Company announced it had discovered accounting irregularities in connection with certain perpetual software licenses and that the Company's

2

financial statements for fiscal years 2009, 2010, and 2011, as well as the quarters ending March 31, 2012 and June 30, 2012 would have to be restated. As a result of this announcement, KIT shares declined nearly 65% in one trading day.

4. As further evidence of Defendants' misconduct, on August 31, 2011 Defendants granted themselves huge performance-based restricted stock awards worth as much as approximately $13 million. The vast majority of the stock award was contingent on the Company's stock price reaching certain levels. This compensation structure provided certain Defendants with a huge incentive to inflate the stock price of the Company, and was awarded just months after Defendants began to make materially false and misleading statements about the performance of the Company.

5. Although Defendants, due to their positions as directors of the Company, had access to non-public material information regarding the Company's sales figures, projections, inventory, and market conditions in specific regions, Defendants concealed these harsh truths from the investing public during the Relevant Period. Furthermore, they allowed the Company to issue materially false and misleading statements regarding the Company's business practices and financial condition, all while lacking a sufficient basis for the positive statements and optimistic outlooks they disseminated to KIT's shareholders and the investing public.

6. Defendants harmed the Company by allowing it to issue materially false and misleading statements, resulting in a loss of significant Company value and exposure to federal securities law violations. Indeed, as a result of Defendants' wrongful acts and omissions, the Company is now exposed to millions of dollars in defense costs and potential liability as a result of securities class action litigation filed against the Company.

7.      As a result, Plaintiff seeks to recover damages suffered, and to be suffered, by the Company as a result of the wrongful acts of its directors as described herein.

## II.     JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

9.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     Venue is proper in this district because nominal defendant KIT maintains its principal executive offices in the District.

## III.    PARTIES

11.     Plaintiff, Marek Vasut, is a current shareholder of KIT and has held KIT stock at all times during the Relevant Period. Plaintiff purchased his shares between November 2011 and March 2012 and has held them continuously.  Plaintiff is a citizen of the Czech Republic.

12.     Nominal defendant KIT is a corporation organized and existing under the laws of Delaware.  KIT maintains its principle executive offices located at 26 West 17th Street, 2d Floor, New York, New York 10011. KIT is named herein solely for the purpose of providing full and complete relief.

13.     Defendant Kaleil Isaza Tuzman ("Tuzman") was at all relevant times, President, Chief Executive Officer, and Chairman of the Board of Director's during the Relevant Period. Therefore, he signed and certified the Company's SEC filings during the Relevant Period.

Additionally, during the Relevant Period, Tuzman sold over $7 million of KIT stock through a private equity group that he controlled.  Tuzman is a resident of Utah.

14.     Defendant Robin Smyth ("Smyth") was at all relevant times during the Relevant Period, Chief Financial Officer Accounting Officer and a Director of the Company. Smyth signed and certified the Company's SEC filings during the Relevant Period.  Upon information and belief, Smyth is a resident of the United Arab Emirates.

15.     Defendant Gavin Campion ("Campion") was at all relevant times during the Relevant Period, President and Director of the Company. During the Relevant Period, Defendant Campion made various false or misleading statements regarding the Company's financial prospects and projected revenue.   Upon information and belief, Campion is a resident of Australia.

16.     Defendant Christopher Williams ("Williams") was at all relevant times during the Relevant Period, Executive Vice President, Product Development and Director of the Company. Williams is a resident of Massachusetts.

17.     Defendant Daniel W. Hart ("Hart") was at all relevant times during the Relevant Period a Director of the Company.  Hart is a resident of California.

18.     Defendant Lars Krojier ("Krojier") was at all relevant times during the Relevant Period a Director of the Company and a member of the Audit Committee.  Krojier is a resident of the United Kingdom.

19.     Defendant Joseph E. Mullin III ("Mullin") was at all relevant times during the Relevant Period a Director of the Company.  Mullin was the Chairman of the Audit Committee during the Relevant Period.  Mullin is a resident of New York.

20.     Defendant Santo Politi ("Politi") was at all relevant times during the Relevant Period a Director of the Company.   Upon information and belief, Politi is a resident of Massachusetts.

21.     Defendant Wayne Walker ("Walker") was at all relevant times during the Relevant Period a Director of the Company and a member of the Audit Committee.   Upon information and belief, Walker is a resident of Pennsylvania.

22.     The Defendants identified in paragraphs 13 and 14 are collectively referred to as the "Management Defendants."   The Defendants identified in paragraphs 13-21 are collectively referred to as the "Individual Defendants" or the "Board."   The Individual Defendants and KIT are collectively referred to herein as the "Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits.   Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

24.     To discharge their duties, the officers and directors of KIT were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of KIT.  By virtue of such duties, the officers and directors of KIT were required to, among other things:

(a) manage, conduct, supervise and direct the business and internal affairs of KIT in accordance with the laws and regulations of New York, Delaware, the United States, and pursuant to the charter and bylaws of KIT;

(b) neither violate, nor knowingly permit any officer, director or employee of KIT to violate applicable laws, rules and regulations;

(c) remain informed as to the status of KIT's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of KIT and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that KIT's operations would comply with all laws, KIT's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to KIT shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f) exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of KIT by the officers and employees of KIT and any

other reports or other information required by law from KIT and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of KIT and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

25. During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of KIT, were privy to confidential and proprietary information concerning KIT, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning KIT, as discussed in detail below. Because of their positions with KIT, the Individual Defendants had access to nonpublic information about its business, finances, products, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that adverse facts specified herein had not been disclosed to, and were being concealed from, the Company's shareholders, the SEC, and the public.

26. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to shareholders and the public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to, and did, cause or

allow the fraudulent acts alleged herein.

27.    Moreover, the members of the Board of Director's Audit Committee (the "Audit Committee") were responsible for maintaining and establishing adequate internal accounting controls for the Company and its accounting and financial reporting processes.  The Audit Committee was formed in 2008 and performs its functions pursuant to the Audit Committee Charter.

28.    According to the Company's Form 10-K/A that was filed with the SEC on April 30, 2012, the "principal functions" of the Audit Committee are:

(a)    Recommending to the Board of Directors the engagement or discharge of our independent public accountants, including pre-approving all audit and non-audit related services;

(b)    The appointment, compensation, retention and oversight of the work of the independent auditor engaged by us to prepare or issue an audit report or perform other audit review or attest services for us;

(c)    Establishing procedures for the receipt, retention and treatment of complaints received regarding accounting, internal accounting controls or auditing matters and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

(d)    Approving the scope of the financial audit;

(e)    Requiring the rotation of the lead audit partners;

(f)    Consulting regarding the completeness of our financial statements;

(g)    Reviewing changes in accounting principles;

(h)    Reviewing the audit plan and results of the auditing engagement with our independent auditors and with our officers;

(i)    Reviewing with our officers, the scope and nature and adequacy of our internal accounting and other internal controls over financial reporting and disclosure controls and procedures;

(j)    Reviewing the adequacy of the Audit Committee Charter at least annually;

(k)     Meeting with our Internal Auditor on a regular basis;

(l)     Performing an internal evaluation of the Audit Committee on an annual basis; and

(m)     Reporting to the Board of Directors on the Audit Committee's activities, conclusions and recommendations.

29.     Additionally, the Audit Committee Charter states the purpose of the Audit Committee is:

(a)     To oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

(b)     To provide assistance to the Board of Directors with respect to its oversight of the following:

(i)     The integrity of the Company's financial statements.

(ii)    The Company's compliance with legal and regulatory requirements

(iii)   The independent auditor's qualifications and independence.

(iv)    The performance of the Company's internal audit function, if any, and independent auditor.

(c)     To prepare the report that SEC rules require be included in the Company's annual proxy statement.

30.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and continues to be, registered with the SEC pursuant to the Exchange Act, the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to KIT's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the

market price of KIT's common stock would be based upon truthful and accurate information.

31.     The Company and the Management Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, the Individual Defendants breached their fiduciary duties by causing and/or recklessly permitting violations of federal securities laws.

32.     Moreover, each of the directors has breached his or her fiduciary duties by failing to properly supervise management in permitting the corporate culture at the Company that fostered wrongdoing.  As established *infra,* the Board failed its duty to implement and oversee adequate internal controls over the Company's financial reporting.

33.     During the Relevant Period, KIT's Board consisted of nine (9) directors: Tuzman, Campion, Smyth, Williams, Hart, Krojier, Mullin, Politi, and Walker.  As established *infra*, KIT's Board of Directors, despite numerous calls for it to do so, ignored its duty to make an impartial determination as to whether legal proceedings should be instituted to redress the wrongdoing alleged herein.

## V.     FURTHER SUBSTANTIVE ALLEGATIONS

### (a)     Background

34.     KIT, through its subsidiaries, provides end-to-end video asset management software and related services to enterprise clients. It offers the KIT Video platform for managing Internet protocol (IP)-based video assets across browser environments, mobile and tablet devices, and connected television (TV) sets. The KIT platform solutions include KIT Cosmos, a managed private cloud solution for broadcast-grade Internet protocol television and OTT multiscreen video deployments; and KIT Cloud, a multi-tenant cloud, turnkey solution for multiscreen interactive and social video publishing and monetization. Its solutions also include

KIT Platform Operations Manager, a proprietary operational support system for broadband head-ends that reduces the cost, risk, complexity, and time-to-market of deploying broadband-delivered video solutions; and KIT Connected Device Framework, which enables delivery of social video apps to connected TVs, set-top boxes, game consoles, tablets, and smartphones. In addition, the company provides a suite of professional and integration services supporting the design, integration, and management of its platform deployments; digital content services, such as localization, editing, and packaging; digital marketing; and creative interface design and broadcast engineering services.

35.     KIT serves various client markets, including the network operators, media companies, broadcasters/television, non-media enterprises, brands and agencies, corporate, and government and non-profit organizations.  The Company sells its products directly and through resellers in Europe, the Middle East, Africa, the Americas, and the Asia Pacific. The company was formerly known as ROO Group, Inc. and changed its name to KIT digital, Inc. in May 2008. KIT was founded in 1998 and is headquartered in New York, New York.

36.     Defendant Tuzman became Chairman of the Board of Director and Chief Executive of KIT in 2008. Shortly after Tuzman became Chairman and CEO, he initiated an aggressive acquisition strategy. Within 48 months of Tuzman's appointments, KIT acquired 13 companies, including the following:

(a)     On May 14, 2008 the Company acquired 51% of Sputnik Agency Pty, Ltd., an Australian company, at a cost of $4.6 million.

(b)     On May 19, 2008, the Company acquired Kamera Content AB, a Swedish company, for an amount in excess of $4.5 million.

(c)     On August 13, 2008, the Company acquired Morpheum Internet Services Pty. Inc., an Australian company, at a cost of $790,000.

(d)   On October 5, 2008, the Company, through its wholly owned subsidiary KIT digital FZ-LLC, acquired Visual Connection, A.S., a Czech Republic based company, for an amount in excess of $3 million in cash and stock.

(e)   On April 8, 2009, the Company acquired operating assets and assumed liabilities of Narrowstep, Inc., a UK and US based internet TV platform company, in exchange for 25,000 shares of restricted stock.

(f)   On October 1, 2009, the Company acquired The Feed Room, Inc., a US company engaged in online video communications, in exchange for some 1.2 million shares of KIT stock.

(g)   On October 1, 2009, the Company acquired Nunet AG, a German company engaged in broadband video management, for a purchase price in excess of $12 million.

(h)   On March 16, 2010, the Company acquired Multicast Media Technologies Inc., a US corporation engaged in internet broadcasting, for 1.3 million shares of KIT common stock as well as $4.75 million in cash.

(i)   On January 26, 2011, the Company acquired Kewego, a French corporation that provides IP based, multi-screen video asset management solutions, for 1.4 million shares of KIT stock and $4.6 million in cash.

(j)   On January 28, 2011, the Company acquired KickApps Corporation, a US corporation providing solutions for video based solution experiences online, for 2.9 million shares of KIT stock and $4 million in cash.

(k)   On May 2, 2011, the Company acquired loko365 Ltd. a U.S. and U.K. company that provided multi-screen cloud based end to end managed solutions, for 1.5 million shares of KIT stock and $74.4 million in cash.

(l)   On May 17, 2011, the Company acquired Polymedia S.p.A., an Italian company providing IP video platform solutions, for 1.1 shares of KIT stock and $24.2 million in cash.

(m)   On December 30, 2011, the Company acquired Sezmi Corporation ("Sezmi"), a US corporation providing broadband/broadcast hybrid TV solutions. The Company paid approximately $16 million in upfront cash-based consideration (including the assumption of liabilities) and approximately $11 million in KIT digital common stock (or approximately 1.2 million shares). The initial consideration is exclusive of future earn-outs.

37.   The Company was unable to successfully integrate the aforementioned acquired assets according to plan during the Relevant Period. This inability to integrate the acquired

entities caused the Company to suffer from a number of undisclosed adverse factors that had a detrimental impact on KIT's business, ultimately causing the Company to report financial results that fell well short of Defendants' projections.

38.     At all times during the Relevant Period, the Company was not achieving the growth in earnings or revenues that Defendants projected because of its inability to successfully integrate its acquisitions. Specifically, the Management Defendants recklessly disregarded or knowingly overstated the effectiveness of the Company's integration, significantly overstated the Company's growth and profitability, falsely stated the Company was positioned for substantial financial success in the future, and falsely represented the Company implemented adequate accounting systems that were capable of producing true, accurate, and reliable financial statements. In light of the aforementioned factors, the Defendants did not have any reasonable basis to claim KIT was operating according to plan or could realistically achieve the projections and guidance championed they championed.

   **(b) <u>Materially False and Misleading Statements Issued During the Relevant Period</u>**

39.     During the Relevant Period, the Company issued various false and misleading statements, including, but not limited to, the following assertions made in KIT's public filings, press releases, and conference calls.

40.     On November 9, 2011, the start of the Relevant Period, the Company issued a press release announcing purported record breaking financial results for the first quarter of fiscal 2011. The Company's then-current Chief Executive Officer Tuzman commented on the Company's successful quarter and provided a glowing view of its business prospects for the fourth quarter of 2011 and fiscal year 2012:[1]

---

[1] Unless otherwise indicated, all emphasis is added.

These record results, particularly in what has historically been a seasonally weak quarter, ***reflect our ability to drive strong organic revenue growth while increasing the operating leverage and margin profile of our business," said KIT digital's chairman and CEO, Kaleil Isaza Tuzman.*** "The third quarter marked an important milestone for the company, as we crossed over to GAAP net profitability and recognized the last remaining restructuring and integration charges related to the acquisitions we completed in the first half of the year. ***This will allow us to take advantage of strong free cash flow generation going forward, which we expect to be at least $2.5 million per month by the end of Q4.***"

***

**Growth Outlook**

KIT digital expects revenues in Q4 2011 of at least $67 million, representing a prospective 8% sequential and organic increase over Q3, and up 74% from $38.4 million in the same year-ago period. ***This Q4 guidance implies a revenue expectation for the full year of 2011 of approximately $212 million, representing an increase over 2010 of approximately 100% overall and more than 35% organically***.

KIT digital expects record operating EBITDA in Q4 2011 of approximately $17.5 million, representing an increase of over 20% sequentially, and up over 150% from $6.7 million in the same period a year ago.

***

***Although KIT digital management expresses an upward revision bias to its previously stated 2012 revenue guidance, for now it reaffirms the expectation of at least $300 million of revenues next year, with an organic growth rate for 2012 of approximately 25-30% (given expected pro forma revenues of approximately $238 million for 2011 when back-dating acquisitions completed during the year to January 1, 2011).***

41.     Following the issuance of the above-referenced press release, on November 9, 2011 the Company filed its Form 10-Q with the SEC for the period ending September 30, 2011. In the Form 10-Q, the Company affirmed and reiterated the financial results for the quarter. Furthermore, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Tuzman and Smyth that the information contained in the Form 10-Q was accurate and that any and all material changes to the Company's internal controls over financial reporting had been disclosed.

15

42.    Also on November 9, 2011, Tuzman hosted a conference call with investors, analysts, and members of the press to discuss the Company's financial results for the third quarter of fiscal 2011. On the call, Tuzman touted the Company's record third quarter, informed investors that KIT's integration charges were complete, and reaffirmed the Company's lofty guidance for the fourth quarter of fiscal 2011 and fiscal 2012. Tuzman stated, in relevant part:

> ***Revenue in the third quarter reached a record $62.3 million. This represented a 29% sequential increase over the second quarter and an increase of almost 125% over the same quarter a year ago. We also generated record operating EBITDA of $14.3 million, up 49% sequentially and over 200% from the same year-ago quarter.***
>
> On an organic basis our third quarter revenue is up 11% sequentially during the quarter from a pro forma Q2 revenue level of approximately $56 million when you back-date the closure of the Polymedia and Nioku acquisitions on April 1, 2011. Thus, in a third quarter, we were on an annualized organic growth pace of over 40%. ***These record results, particularly in what is usually a seasonally weak quarter for our industry, reflected our ability to drive strong top-line growth while increasing the operating leverage and margin profile of our business.***
>
> Q3 marked a major milestone for the Company. We launched our next-generation KIT Video platform in both out tier 1 KIT Cosmos edition and our mid-tier KIT Cloud edition and we crossed over to GAAP net profitability.
>
> ***
>
> In the quarter we ***also recognized the last remaining integration charges related to the acquisitions completed in the first half of the year***, which came in line with our expectations of around $2.5 million for the quarter. We do not expect any such charges in Q4. We can now take advantage of free cash flow generation going forward in our business, which we expect to be more than $2.5 million per month by the end of Q4."
>
> ***
>
> As you can tell, we're very excited about both our financial and operational progress in Q3. I'd now like to turn to our financial outlook. Here's what we're setting for KIT Digital for the remainder of 2011 and 2012. ***We expect to report revenues in Q4, 2011 of at least $67 million. This would represent an 8% sequential and organic increase over Q3 and imply a revenue expectation for the overall fiscal year of 2011 of approximately $212 million, a little bit above our annual guidance, and 100% top-line and over 35% organic growth increase over fiscal-year 2010.***

*For Q4 of this year, we expect EBITDA of approximately $17.5 million, in line or slightly above annual guidance previously provided and representing an increase of 20% plus sequentially and up more than 150% over Q4 of last year…* we plan to start reporting a new cash or adjusted EPS metric, which we expect to be at least $0.33 per share in this Q4.

Now, for 2012. *Although we've expressed an upward revision bias to our previously stated 2012 revenue guidance, for the time being we are reaffirming our expectation of at least $300 million of revenues next year*, representing an organic growth rate for 2012 of between 25% and 30%. That is based on an expected pro forma revenue of approximately $238 million for 2011 when you back-date the acquisitions we completed during the course of the year to January 1, 2011. We expect to report cash or adjusted EPS of at least $1.45 per share for the full year of 2012 after tax and so forth."

43.     In a January 6, 2012 press release, Tuzman informed investors that the Company expected to fulfill its financial projections for the fourth quarter and fiscal 2012. Furthermore, Tuzman commented on KIT's acquisition and successful integration of Sezmi. Specifically, Tuzman stated, "We are pleased to have been in a position to complete this acquisition in such a way that improves both our technology and cash-generation profile, while creating long-term value for shareholders." After the Sezmi acquisition, the Company raised its projected revenues.

44.     On February 27, 2012, the Company issued a press release announcing its financial results for the fourth quarter of fiscal 2011. The press release stated:

Based on preliminary unaudited information, KIT digital management *expects to report record revenue for the fourth quarter of 2011 of approximately $70 million. This would exceed the company's guidance by approximately $3 million, and represent a 12% increase from the previous quarter and 82% versus the fourth quarter of 2010.*

45.     Based on the Company's strong 2011 fourth quarter performance, Tuzman provided a glowing outlook for KIT's 2012 fiscal year. In the Company's February 27, 2012 press release, Tuzman was quoted as saying:

*For the first quarter of 2012, KIT digital expects revenues of at least $72 million.* This guidance reflects strong demand, given the historically flat-to-downward industry seasonality in Q1 over Q4 and the fact that revenue

contributions from the company's acquisition of Sezmi Corporation on December 30, 2011 are not expected to ramp up meaningfully until the latter half of 2012. Cash-based adjusted EPS is expected to be between $0.25 and $0.30 in Q1 2012, depending on the timing of certain investments as described below.

***KIT digital management also updated its 2012 guidance, and currently expects revenue of $320 million to $330 million, as compared to $320 million previously.*** This guidance represents an organic annual growth rate of more than 25% when assuming full year 2011 contributions for the acquisitions of KickApps, Kyte, Kewego, WWB, ioko, Polymedia and Sezmi.

46.     On March 15, 2012, the Company issued  a press release reiterating the results for the fourth quarter 2011 and the full year 2011.  The Company reported GAAP net income of $2.2 million for the fourth quarter, or $0.05 per share, and revenue of $70 million.  For the full year 2011, the Company reported a GAAP net loss of $25.4 million, on revenues of $214.9 million.  The Company reaffirmed its guidance from the previous quarter.

47.     The statements in ¶¶ 40-46 were misleading because they failed to disclose material facts, including that the Company had not been able to fully integrate its acquisitions and had failed to put the appropriate policies in place to handle the growth.  Additionally, the Company failed to disclose that it had no reasonable basis for issuing financial guidance incorporating annual growth rates of 25-35%.

**(c) <u>The Truth Begins to Emerges</u>**

48.     On March 16, 2012, the Company filed a notification of late filing with the SEC for its Form 10-K for the period ending December 31, 2011.

49.     On March 23, 2012, the Company announced that four directors resigned from the Board and Tuzman would resign as Chief Executive Officer within six months. Following the announcement, the Company's shares declined 20%.

50.     Hoping to calm investors and pacify the market, the Company issued a press release on March 23, 2012. The release provided in relevant part:

KIT digital, Inc. . . .today announced that its chief executive officer, Kaleil Isaza Tuzman, will assume the role of chairman and Barak Bar-Cohen, currently the company's chief administrative officer, will assume the role of interim CEO while the company conducts a search -- internally and externally -- for a permanent CEO. These changes will be effective on March 31, 2012.

The company has had a longstanding plan to change its board composition, in part as a response to periodic shareholder requests. As such, the company is reducing the number of inside directors and paving the way for new outside members of the board. ***The company has accepted the resignations from the board of management members Gavin Campion, Robin Smyth, Chris Williams, and independent director Santo Politi.***

The board is now composed of ***non-executive chairman Isaza Tuzman and four continuing independent directors: Wayne Walker (lead independent director), Dan Hart, Lars Kroijer, and Joseph Mullin.*** The company intends to expand the board over the coming months with additional independent directors, and also anticipates that the future, permanent CEO will serve as a director as well. Messrs. Campion, Smyth, and Williams will continue in management roles at KIT.

51.    On March 30, 2012, the Company filed its Form 10-K, which reiterated the Company's guidance, quarterly financial results, and accounting positions.  The Form 10-K included SOX certifications signed by Tuzman and Smyth.

52.    The Form 10-K also disclosed that management concluded the Company's internal control over financial reporting was ineffective as of December 31, 2011.  Specifically, the Form 10-K disclosed:

A material weakness was identified in its internal control over financial reporting related to the lack of US GAAP trained finance personnel in the regional and local offices responsible for providing monthly financial information for US GAAP consolidated financial statements.  There were not enough qualified resources at corporate to review and ensure that all transactions were reporting in accordance with US GAAP on a timely basis.

53.    A report by Grant Thornton LLP ("Grant Thornton"), the Company's independent auditor, which was contained within the Form 10-K disclosed that the Company lacked accounting personnel with "an adequate understanding of US GAAP."  The report further

disclosed that in Grant Thornton's opinion, "because of the effect of the material weakness described above on the achievement of the objective of the control criteria, KIT digital, Inc. and Subsidiaries has [sic] not maintained effective control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control—Integrated Framework* issued by COSO."

54.     Several weeks later, on April 11, 2012, Tuzman unexpectedly resigned as the Company's Chairman of the Board of Directors. The Company announced Tuzman's resignation on April 16, 2012.

55.     On May 2, 2012, the Wall Street Journal published a scathing article about the Company. The Wall Street Journal reported:

> **Kaleil Isaza Tuzman left a mess at KIT** digital that his successor, Barak Bar-Cohen, may have a tough time cleaning up. Among Mr. Bar-Cohen's first big moves may be to backtrack on the financial projections made to shareholders.

> **"You won't hear me reiterate guidance,"** Mr. Bar-Cohen, KIT's new chief executive, told The Wall Street Journal on Tuesday. He said he plans to reset the bar on financial results he believes the company can achieve in the future.

> Mr. Tuzman was the star of "Startup.com," a documentary that followed the rise and fall of one of his previous ventures. At KIT, he acquired 19 companies in an effort to create an online video technology powerhouse. Since 2009, KIT has raised $268 million via stock sales to help fund the deals. ***The company enjoyed positive stock recommendations from some Wall Street analysts whose firms also sponsored those stock sales. But KIT didn't properly integrate the acquisitions or put the necessary corporate structure in place to handle its own growth.***

> In its latest annual financial filing, KIT's auditor said the company is short of accounting personnel to review its transactions, citing a material weakness in internal controls. ***Indeed, KIT filed the document late due to questions about the valuation of past acquisitions.***

> ***KIT has also had trouble tracking cash in the bank. When it reported fourth-quarter results, KIT said it had $47.8 million of cash as of Dec. 31. Two weeks later, in the annual filing, it said the figure was $45.7 million. And cash may take a further hit.*** The company is in violation of a debt covenant that says it must keep 75% of its cash in the U.S. To comply, it may have to repatriate cash, incurring taxes.

***Mr. Tuzman is himself facing scrutiny from the SEC over stock trades from June 2010. It sent subpoenas to Mr. Tuzman and the company in February.***

56.     In a May 3, 2012 press release, the Company revealed that it was performing well below guidance. Importantly, the press release reported a loss for the first quarter of fiscal 2012, stating:

> Based on preliminary unaudited information, KIT digital management expects to report revenue for the first quarter of 2012 of approximately $59 million, and a non-GAAP operating loss in the first quarter of 2012 of approximately $8 million.
>
> ***Contributing to the lower than expected financial results, the company cited longer than anticipated sales cycles for a number of larger opportunities, increased personnel costs associated with deployments in future quarters, payments of assumed liabilities arising from the acquisition of Sezmi***, and higher than expected legal and advisory fees, among other factors.

57.     In the same release, the Company's new CEO, Barak Bar-Cohen ("Bar-Cohen"), indicated the Company would revisit and lower its previous projections and guidance. The press release stated:

> "Over the last several weeks, the management team and I have performed a detailed review of our lines of business and their cash flow contributions, and ***have determined that previous guidance was too high***," said Barak Bar-Cohen, KIT digital's CEO. "During our quarterly earnings call, we will present a revised operating plan and financial outlook for a growing, cash-generative software business.
>
> *              *              *
>
> Contributing to the lower than expected financial results, the company cited longer than anticipated sales cycles for a number of larger opportunities, increased personnel costs associated with deployments in future quarters, payments of assumed liabilities arising from the acquisition of Sezmi, and higher than expected legal and advisory fees, among other factors.

58.     On May 3, 2012, after the Company's press release, KIT shares declined 27%. KIT shares opened trading at $4.57 per share and fell to a low of $4.12 per share the day of the press release.

59.     On May 15, 2012, the Company released its financial results for the first quarter of fiscal 2012. The Company's release stated, in relevant part:

> **First quarter GAAP net loss was $24.9 million or $0.53 per share, compared to GAAP net income of $0.4 million or $0.01 per share in the preceding quarter and GAAP net loss of $12.5 million or $0.34 per share in the first quarter of 2011.** Free cash flow from operations was a negative $12.9 million, compared to a positive $1.3 million in the previous quarter, and a negative $10.2 million in the first quarter of 2011.
>
> **Cash and cash equivalents at March 31, 2012 totaled $26.1 million, compared to $45.7 million on December 31, 2011.** The decrease in Q1 was primarily attributable to one-time residual payments of consideration for acquisitions closed in Q4; higher than usual legal, accounting and audit costs associated with corporate development activity; post-consolidation integration costs; and other cash requirements of the business during the quarter, which were in line with previous quarters.

60.     On August 14, 2012, the Company filed its Form 10-Q for the second quarter 2012.   In the press release announcing second quarter results, the Company's new Chief Financial Officer, Fabrice Hamaide, acknowledged the Company's faulty accounting and stated during his short tenure the Company has "made great strides toward implementing best practices across the finance and accounting operation, including significantly improved financial controls, and a more robust budgeting and forecasting process."

61.     On November 21, 2012, the Company filed a Form 8-K stating the Board of Director's Audit Committee concluded the financial statements for fiscal years 2009, 2010, and 2011, all included quarters, and the quarters ended March 31, 2012 and June 30, 2012 needed to be restated.  As a result, the Company stated that investors should not rely upon the financial statements prepared for those periods.

62.     On November 23, 2012, the first trading day following the announcement of the need for restatement, the Company's shares declined nearly 65%, from a closing price of $2.07 on November 21, 2012 to a closing price of $0.74 on November 23, 2012.

63.     As a result of Defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock has still not recovered.

64.     On December 12, 2012 the Company received notice that its common stock would be delisted from NASDAQ effective December 21, 2012.  The delisting was precipitated by the Company's failure to make timely payment of listing fees as required by the NASDAQ Listing Rules.

65.     Additionally, on December 17, 2012, the Audit Committee dismissed its independent accounting firm, Grant Thornton.

66.     As a result of the Individual Defendants' misconduct, the Company is now the subject of class action litigation alleging violation of the federal securities laws, which necessitates the Company incurring wasteful costs and risks arising from the Individual Defendants' wrongful course of conduct.

67.     Accordingly, KIT has been damaged.

## VI.     DERIVATIVE ALLEGATIONS

68.     Plaintiff brings this action derivatively on behalf of and for the benefit of KIT to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein. The Company is a nominal defendant named solely in a derivative capacity.

69.     Plaintiff purchased shares of KIT and continued to hold such shares at all relevant times and through the present.  Thus, Plaintiff was a KIT shareholder during the wrongdoing complained of herein.

70.     Plaintiff will fairly and adequately represent the interests of the Company, and has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

71.     The wrongful acts complained of herein subject, and will persist in subjecting KIT, to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

## VII.   DEMAND HAS BEEN PROPERLY MADE AND IMPROPERLY REJECTED

72.     Plaintiff brings this action derivatively in the right and for the benefit of KIT to redress injuries suffered and to be suffered by KIT as a direct result of defendants' breaches of fiduciary duty, corporate waste and unjust enrichment.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

73.     Plaintiff served a demand letter on KIT's Board of Directors on October 9, 2012, demanding that the Board bring claims on behalf of the Company for breach of fiduciary duty. The letter demanded that the Board investigate, institute litigation, and implement new and stronger controls to prevent a recurrence of the wrongdoings identified herein.  (*See* Exhibit A.)

74.     The Board, through its Acting Corporate Counsel, responded on November 12, 2012.  The letter stated that the Audit Committee, with the exception of Defendant Walker, had been authorized to investigate the matters in the demand letter.  (*See* Exhibit B.)

75.     Plaintiff subsequently responded on November 19, 2012.  This letter provided additional information alleged herein and requested information concerning the current members of the Audit Committee, whether counsel had been retained for the Audit Committee, and when the Audit Committee would be expected to conclude its findings.  (*See* Exhibit C.)

76. The Board, again through its Acting Corporate Counsel, responded on December 10, 2012, stating only that the Audit Committee had retained outside counsel, and any further communications should be directed to outside counsel. (*See* Exhibit D.)

77. On December 18, 2012, Plaintiff responded with a letter to the Audit Committee's outside counsel, Jones Day LLP, again requesting information concerning the status of the Audit Committee's investigation, noting Plaintiff's demand had been outstanding for over two months. (*See* Exhibit E.)

78. Plaintiff requested a response within 21 days, or by January 8, 2012. Plaintiff has received no response to this letter.

79. The Audit Committee has ignored Plaintiff's demand and has failed to make any investigation into the matters alleged. Plaintiff, therefore, deems his demand rejected; however without any investigation, the Audit Committee has no basis for rejecting Plaintiff's demand.

## COUNT I

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY AND DISSEMINATING FALSE AND MISLEADING INFORMATION

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. As alleged in detail herein, each of the Individual Defendants, as Directors of the Company, had a duty to ensure that KIT disseminated accurate, truthful and complete information to its shareholders.

82. The Individual Defendants violated their fiduciary duties of candor, care, loyalty, and good faith by causing the Company to disseminate to its shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and

disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

83.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered, and will continue to suffer substantial damages.

## COUNT II

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     The Individual Defendants owed and owe to KIT fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and continue to owe KIT the highest obligations of good faith, fair dealing, loyalty and due care.

86.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

87.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, KIT has sustained substantial damages, not only monetarily, but also to its corporate image and goodwill.

88.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

89.     To the extent Plaintiff on behalf of KIT seeks equitable relief, he has no adequate remedy at law.

## COUNT III

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

91.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KIT, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing KIT to misrepresent material facts regarding its financial position and business prospects.

92.     As a direct and proximate result of the Individual Defendants' abuse of control, KIT has sustained substantial damages.

93.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

94.     To the extent Plaintiff on behalf of KIT seeks equitable relief, he has no adequate remedy at law.

**COUNT IV**

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     The Individual Defendants had a duty to KIT and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of KIT.

97.     The Individual Defendants, by their actions including the wrongdoing described herein, abandoned and abdicated their fiduciary responsibilities and duties with regard to prudently managing the businesses of KIT in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their

fiduciary duties of due care, diligence and candor in the management and administration of KIT's affairs and in the use and preservation of KIT's assets.

98.     During the course of the discharge of their duties, the Individual Defendants knew or wrongfully disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused KIT to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to KIT, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged KIT, thereby causing the Company to suffer substantial damages.

99.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT V

## AGAINST ALL INDIVIDUAL
## DEFENDANTS FOR WASTE OF CORPORATE ASSETS

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused KIT to incur (and likely to continue to incur) a significant risk of legal liability and legal costs to defend itself as a result of the Individual Defendants' wrongful actions.

102.     As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

103.     To the extent Plaintiff, on behalf of KIT, seeks equitable relief, he has no adequate remedy at law.

## COUNT VI

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

1.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

2.      By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of KIT.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to the Company.

3.      Additionally, Tuzman, through his investment fund, sold KIT stock while in possession of material, adverse, non-public information that, in being concealed, allowed the share price of KIT stock to remain artificially inflated.  As a result, Tuzman profited from his misconduct and was unjustly enriched through his exploitation of this material and adverse inside information.

4.      Plaintiff, as a shareholder and representative of KIT, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from or in the course of their wrongful conduct and fiduciary breaches.

5.      Plaintiff, on behalf of KIT, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing KIT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to KIT restitution from the Individual Defendants, together and individually, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: February 21, 2013

LEVI & KORSINSKY LLP

Eduard Korsinsky
30 Broad Street
24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

LEVI & KORSINSKY LLP
Nicholas I. Porritt
Thomas M. Gottschlich
1101 30th Street, N.W.
Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

*Attorneys for Plaintiff*

Exhibit A

# LeviKorsinsky LLP

Attorneys at Law

1101 30th St., NW, Suite 115
Washington, DC 20007
T: 202 524 4293
F: 202 333-2121
www.zlk.com

Nicholas I. Porritt
nporritt@zlk.com

October 9, 2012

VIA FEDEX

The Board of Directors
of KIT Digital, Inc.
26 West 17th Street, 2nd Floor
New York, NY 10011

> *Re:* Demand Upon The Board of Directors to Investigate Claims, Initiate
> Legal Action and Take Necessary and Appropriate Remedial Measures

To the Board of Directors of KIT Digital, Inc.:

This firm represents Marek Vasut, who is, and at all times relevant to the issues addressed in this letter, was a shareholder KIT Digital, Inc. ("KIT" or the "Company"). This letter is intended to act as a demand on KIT's board of directors (the "Board") to investigate, institute litigation and take all other necessary remedial measures to prevent a recurrence of the wrongdoings identified in this demand letter. This letter relates to the Board's breaches of fiduciary duties from November 8, 2011 to May 3, 2012 (the "Relevant Period").

During the Relevant Period, the Company issued false and misleading statements in its public filings, press releases, and conference calls that failed to disclose (a) that the Company was not achieving the growth in earnings or revenues that it claimed because it overstated the effectiveness of integrating acquired corporations; (b) that the Company overstated its growth and profitability; (c) that the Company falsely represented it had implemented adequate accounting systems that were capable of producing true, accurate, and reliable financial statements; and (d) that in light of these factors, the Company did not have any reasonable basis to claim that it was operating according to plan or could realistically achieve its projections. Meanwhile, the Board knew and had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements being issued during the Relevant Period were materially false and/or misleading. Notwithstanding the above, the members of the Board consciously disregarded their duty of oversight and their duty to ensure that a reasonable reporting system was in place, but rather allowed the Company to issue the materially false and misleading statements. When the truth about the Company was revealed, KIT shares declined 27% in one day and investors filed a securities fraud class action against the Company.

## The False and Misleading Statements

During the Relevant Period, the Company issued various false and misleading statements, including, but not limited to, the following assertions made in KIT's public filings, press releases, and conference calls.

On November 9, 2011, the start of the Relevant Period, the Company issued a press release announcing purported record breaking financial results for the first quarter of fiscal 2011. The Company's then-current Chief Executive Officer Kaleil Tuzman ("Tuzman") commented on the Company's successful quarter and provided a glowing view of its business prospects for the fourth quarter of 2011 and fiscal year 2012:[1]

> These record results, particularly in what has historically been a seasonally weak quarter, *reflect our ability to drive strong organic revenue growth while increasing the operating leverage and margin profile of our business," said KIT digital's chairman and CEO, Kaleil Isaza Tuzman.* "The third quarter marked an important milestone for the company, as we crossed over to GAAP net profitability and recognized the last remaining restructuring and integration charges related to the acquisitions we completed in the first half of the year. *This will allow us to take advantage of strong free cash flow generation going forward, which we expect to be at least $2.5 million per month by the end of Q4.*"

\*\*\*

> **Growth Outlook**
>
> KIT digital expects revenues in Q4 2011 of at least $67 million, representing a prospective 8% sequential and organic increase over Q3, and up 74% from $38.4 million in the same year-ago period. *This Q4 guidance implies a revenue expectation for the full year of 2011 of approximately $212 million, representing an increase over 2010 of approximately 100% overall and more than 35% organically.*
>
> KIT digital expects record operating EBITDA in Q4 2011 of approximately $17.5 million, representing an increase of over 20% sequentially, and up over 150% from $6.7 million in the same period a year ago.

\*\*\*

> *Although KIT digital management expresses an upward revision bias to its previously stated 2012 revenue guidance, for now it reaffirms the expectation of at least $300 million of revenues next year, with an organic growth rate for 2012 of approximately 25-30% (given expected*

---

[1] Unless otherwise indicated, all emphasis is added.

October 9, 2012
Page 3 of 8

> *pro forma revenues of approximately $238 million for 2011 when back-dating acquisitions completed during the year to January 1, 2011).*

Also on November 9, 2011, Tuzman hosted a conference call with investors, analysts, and members of the press to discuss the Company's financial results for the third quarter of fiscal 2011. On the call, Tuzman touted the Company's record third quarter, informed investors that KIT's integration charges were complete, and reaffirmed the Company's lofty guidance for the fourth quarter of fiscal 2011 and fiscal 2012. Tuzman stated, in relevant part:

> *Revenue in the third quarter reached a record $62.3 million. This represented a 29% sequential increase over the second quarter and an increase of almost 125% over the same quarter a year ago. We also generated record operating EBITDA of $14.3 million, up 49% sequentially and over 200% from the same year-ago quarter.*
>
> On an organic basis our third quarter revenue is up 11% sequentially during the quarter from a pro forma Q2 revenue level of approximately $56 million when you back-date the closure of the Polymedia and Nioku acquisitions on April 1, 2011. Thus, in a third quarter, we were on an annualized organic growth pace of over 40%. *These record results, particularly in what is usually a seasonally weak quarter for our industry, reflected our ability to drive strong top-line growth while increasing the operating leverage and margin profile of our business.*
>
> Q3 marked a major milestone for the Company. We launched our next-generation KIT Video platform in both out tier 1 KIT Cosmos edition and our mid-tier KIT Cloud edition and we crossed over to GAAP net profitability.
>
> \*\*\*
>
> In the quarter we *also recognized the last remaining integration charges related to the acquisitions completed in the first half of the year*, which came in line with our expectations of around $2.5 million for the quarter. We do not expect any such charges in Q4. We can now take advantage of free cash flow generation going forward in our business, which we expect to be more than $2.5 million per month by the end of Q4."
>
> \*\*\*
>
> As you can tell, we're very excited about both our financial and operational progress in Q3. I'd now like to turn to our financial outlook. Here's what we're setting for KIT Digital for the remainder of 2011 and 2012. *We expect to report revenues in Q4, 2011 of at least $67 million. This would represent an 8% sequential and organic increase over Q3 and imply a revenue expectation for the overall fiscal year of 2011 of approximately $212 million, a little bit above our annual guidance, and 100% top-line and over 35% organic growth increase over fiscal-year 2010.*

> *For Q4 of this year, we expect EBITDA of approximately $17.5 million, in line or slightly above annual guidance previously provided and representing an increase of 20% plus sequentially and up more than 150% over Q4 of last year...* we plan to start reporting a new cash or adjusted EPS metric, which we expect to be at least $0.33 per share in this Q4.
>
> Now, for 2012. *Although we've expressed an upward revision bias to our previously stated 2012 revenue guidance, for the time being we are reaffirming our expectation of at least $300 million of revenues next year,* representing an organic growth rate for 2012 of between 25% and 30%. That is based on an expected pro forma revenue of approximately $238 million for 2011 when you back-date the acquisitions we completed during the course of the year to January 1, 2011. We expect to report cash or adjusted EPS of at least $1.45 per share for the full year of 2012 after tax and so forth."

In a January 6, 2012 press release, Tuzman informed investors that the Company expected to fulfill its financial projections for the fourth quarter and fiscal 2012. Furthermore, Tuzman commented on KIT's acquisition and successful integration of Sezmi. Specifically, Tuzman stated, "We are pleased to have been in a position to complete this acquisition in such a way that improves both our technology and cash-generation profile, while creating long-term value for shareholders." After the Sezmi acquisition, the Company raised its projected revenues.

On February 27, 2012, the Company issued a press release announcing its financial results for the fourth quarter of fiscal 2011. The press release stated:

> Based on preliminary unaudited information, KIT digital management *expects to report record revenue for the fourth quarter of 2011 of approximately $70 million. This would exceed the company's guidance by approximately $3 million, and represent a 12% increase from the previous quarter and 82% versus the fourth quarter of 2010.*

Based on the Company's strong 2011 fourth quarter performance, Tuzman provided a glowing outlook for KIT's 2012 fiscal year. In the Company's February 27, 2012 press release, Tuzman was quoted as saying:

> *For the first quarter of 2012, KIT digital expects revenues of at least $72 million.* This guidance reflects strong demand, given the historically flat-to-downward industry seasonality in Q1 over Q4 and the fact that revenue contributions from the company's acquisition of Sezmi Corporation on December 30, 2011 are not expected to ramp up meaningfully until the latter half of 2012. Cash-based adjusted EPS is expected to be between $0.25 and $0.30 in Q1 2012, depending on the timing of certain investments as described below.
>
> *KIT digital management also updated its 2012 guidance, and currently expects revenue of $320 million to $330 million, as compared to $320 million previously.* This guidance represents an organic annual growth rate of more than

October 9, 2012
Page 5 of 8

> 25% when assuming full year 2011 contributions for the acquisitions of KickApps, Kyte, Kewego, WWB, ioko, Polymedia and Sezmi.

**The Truth Emerges**

On March 23, 2012, the Company announced that four directors resigned from the Board and Tuzman would resign as Chief Executive Officer within six months. Following the announcement, the Company's shares declined 20%.

Hoping to calm investors and pacify the market, the Company issued a press release on March 23, 2012. The release provided in relevant part:

> KIT digital, Inc…today announced that its chief executive officer, Kaleil Isaza Tuzman, will assume the role of chairman and Barak Bar-Cohen, currently the company's chief administrative officer, will assume the role of interim CEO while the company conducts a search -- internally and externally -- for a permanent CEO. These changes will be effective on March 31, 2012.

> The company has had a longstanding plan to change its board composition, in part as a response to periodic shareholder requests. As such, the company is reducing the number of inside directors and paving the way for new outside members of the board. ***The company has accepted the resignations from the board of management members Gavin Campion, Robin Smyth, Chris Williams, and independent director Santo Politi.***

> The board is now composed of ***non-executive chairman Isaza Tuzman and four continuing independent directors: Wayne Walker (lead independent director), Dan Hart, Lars Kroijer, and Joseph Mullin.*** The company intends to expand the board over the coming months with additional independent directors, and also anticipates that the future, permanent CEO will serve as a director as well. Messrs. Campion, Smyth, and Williams will continue in management roles at KIT.

> The company reiterates financial guidance provided in its Q4 and FY 2011 earnings release on March 15, 2012.

Several weeks later, on April 11, 2012, Tuzman unexpectedly resigned as the Company's Chairman of the Board of Directors. The Company announced Tuzman's resignation on April 16, 2012.

On May 2, 2012, the Wall Street Journal published a scathing article about the Company. The Wall Street Journal reported:

> **Kaleil Isaza Tuzman left a mess at KIT** digital that his successor, Barak Bar-Cohen, may have a tough time cleaning up. Among Mr. Bar-Cohen's first big moves may be to backtrack on the financial projections made to shareholders.

October 9, 2012
Page 6 of 8

**"You won't hear me reiterate guidance,"** Mr. Bar-Cohen, KIT's new chief executive, told The Wall Street Journal on Tuesday. He said he plans to reset the bar on financial results he believes the company can achieve in the future.

Mr. Tuzman was the star of "Startup.com," a documentary that followed the rise and fall of one of his previous ventures. At KIT, he acquired 19 companies in an effort to create an online video technology powerhouse. Since 2009, KIT has raised $268 million via stock sales to help fund the deals. *The company enjoyed positive stock recommendations from some Wall Street analysts whose firms also sponsored those stock sales. But KIT didn't properly integrate the acquisitions or put the necessary corporate structure in place to handle its own growth.*

In its latest annual financial filing, KIT's auditor said the company is short of accounting personnel to review its transactions, citing a material weakness in internal controls. *Indeed, KIT filed the document late due to questions about the valuation of past acquisitions.*

*KIT has also had trouble tracking cash in the bank. When it reported fourth-quarter results, KIT said it had $47.8 million of cash as of Dec. 31. Two weeks later, in the annual filing, it said the figure was $45.7 million. And cash may take a further hit.* The company is in violation of a debt covenant that says it must keep 75% of its cash in the U.S. To comply, it may have to repatriate cash, incurring taxes.

*Mr. Tuzman is himself facing scrutiny from the SEC over stock trades from June 2010. It sent subpoenas to Mr. Tuzman and the company in February.*

In a May 3, 2012 press release, the Company revealed that it was performing well below guidance. Importantly, the press release reported a loss for the first quarter of fiscal 2012, stating:

Based on preliminary unaudited information, KIT digital management expects to report revenue for the first quarter of 2012 of approximately $59 million, and a non-GAAP operating loss in the first quarter of 2012 of approximately $8 million.

*Contributing to the lower than expected financial results, the company cited longer than anticipated sales cycles for a number of larger opportunities, increased personnel costs associated with deployments in future quarters, payments of assumed liabilities arising from the acquisition of Sezmi,* and higher than expected legal and advisory fees, among other factors.

In the same release, the Company's new CEO, Barak Bar-Cohen ("Bar-Cohen"), indicated the Company would revisit and lower its previous projections and guidance. Bar-Cohen was quoted in the press release as saying:

"Over the last several weeks, the management team and I have performed a detailed review of our lines of business and their cash flow contributions, and *have determined that previous guidance was too high*," said Barak Bar-Cohen, KIT digital's CEO. "During our quarterly earnings call, we will present a revised

operating plan and financial outlook for a growing, cash-generative software business.

Contributing to the lower than expected financial results, the company cited longer than anticipated sales cycles for a number of larger opportunities, increased personnel costs associated with deployments in future quarters, payments of assumed liabilities arising from the acquisition of Sezmi, and higher than expected legal and advisory fees, among other factors.

On May 3, 2012, after the Company's press release, KIT shares declined 27%. KIT shares opened trading at $4.57 per share and fell to a low of $4.12 per share the day of the press release.

On May 15, 2012, the Company released its financial results for the first quarter of fiscal 2012. The Company's release stated, in relevant part:

> ***First quarter GAAP net loss was $24.9 million or $0.53 per share, compared to GAAP net income of $0.4 million or $0.01 per share in the preceding quarter and GAAP net loss of $12.5 million or $0.34 per share in the first quarter of 2011.*** Free cash flow from operations was a negative $12.9 million, compared to a positive $1.3 million in the previous quarter, and a negative $10.2 million in the first quarter of 2011.

> ***Cash and cash equivalents at March 31, 2012 totaled $26.1 million, compared to $45.7 million on December 31, 2011.*** The decrease in Q1 was primarily attributable to one-time residual payments of consideration for acquisitions closed in Q4; higher than usual legal, accounting and audit costs associated with corporate development activity; post-consolidation integration costs; and other cash requirements of the business during the quarter, which were in line with previous quarters.

## The Demand

As noted above, this letter is intended to act as a demand on the Board to investigate the misconduct described herein, institute litigation against the responsible parties, and take remedial measures to prevent a recurrence.

The Board should immediately begin an investigation into the improper statements made on the Company's behalf during the Relevant Period. The Board should also examine the adequacy of KIT's internal controls. To the extent they are not adequate, the Board should take prompt action to remedy the situation by causing KIT to initiate litigation against those responsible for these failures including (i) the Board for causing the Company to issue false and misleading statements and for failing to enact adequate internal controls at the Company, and (ii) current and former executives for their role in distributing or disseminating false and misleading statements. The purpose of the litigation should be twofold: to pursue injunctive relief in order to implement enhanced internal controls to prevent disclosure of false and misleading statements; and to pursue damages to recover for (i) costs incurred in initiating an internal investigation into the improprieties engaged in by the defendants, (ii) the time and expenses incurred prosecuting

October 9, 2012
Page 8 of 8

the securities fraud class action, and (iii) costs incurred from compensation and benefits paid to the defendants who have breached their duties to KIT. Moreover, these actions have irreparably damaged KIT's corporate image and goodwill. For at least the foreseeable future, KIT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have misled the investing public, such that KIT's ability to raise equity capital or debt on favorable terms in the future is now impaired, causing further damage to the Company.

We would also welcome the opportunity to meet with independent members of the Board (to the extent there are any) to discuss these and other ideas we have which would serve to strengthen the Company's disclosure practices.

**The Purpose of this Demand Letter and Time Limits for Response**

The purpose of this demand letter is to give you the first opportunity to investigate and identify the reasons for and the parties responsible for the breaches of fiduciary duty described herein. This letter is also sent to give you or, as the case may be, empower the appropriate persons with the opportunity to institute claims on behalf of the Company against those responsible persons, and to implement new and stronger controls which would help to prevent a recurrence of these failures in the future.

If you fail to respond or contact the undersigned within 30 days of receipt of this letter, we will be forced to assume that you have decided not to pursue any investigation, litigation, or remedial steps and we will be forced to take such action as we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law. If you need additional time to consider or act upon the issues raised in this demand letter or have any other questions concerning this letter, please do not hesitate to contact me. I look forward to hearing from you, and appreciate your prompt attention to this matter.

Very truly yours,

Nicholas I. Porritt

Exhibit B



November 12, 2012

VIA FEDERAL EXPRESS
AND TELECOPY (202-333-2121)

Nicholas I. Porritt, Esq.
Levi Korsinsky LLP
1101 30th Street, NW, Suite 115
Washington, DC 20007

Re:     Demand Letter to the Board of Directors of KIT digital, Inc.

Dear Mr. Porritt:

I am writing in response to your October 9, 2012 letter addressed to the Board of Directors of KIT digital, Inc. (the "Board"). The Audit Committee of the Board, with Mr. Walker recusing himself, has been authorized to lead an investigation into the matters raised in your letter, and the Board will respond to you in due course.

Very truly yours,

Meredith L. Deutsch
Acting Corporate Counsel

Exhibit C

LeviKorsinsky LLP

Attorneys at Law

1101 30th Street, N.W.
Suite 115
Washington, DC 20007
(202) 524-4290

Nicholas I. Porritt
nporritt@zlk.com

November 19, 2012

**VIA FEDERAL EXPRESS**

Meredith L. Deutsch
Acting Corporate Counsel
KIT digital
26 West 17th Street
2d Floor
New York, NY 10011

### *Re: Demand Letter to the Board of Directors of KIT digital, Inc.*

Dear Ms. Deutsch:

I write in response to your letter dated November 12, 2012. In your letter, you stated that the Audit Committee of the Board, absent Mr. Walker, has been authorized to lead an investigation into the matters raised in our October 9, 2012 demand letter. In addition to the allegations outlined in our original letter, this letter contains additional evidence that supplements the demand letter and further demonstrates the lack of adequate internal controls at KIT digital ("KIT" or the "Company").

On October 22, 2012, the Company filed its Preliminary Proxy Statement on Form Schedule 14A ("Preliminary Proxy") with the U.S. Securities and Exchange Commission ("SEC"). The Preliminary Proxy disclosed that on August 31, 2011, the executive officers at KIT, Kaleil Isaza Tuzman, Gavin Campion and Robyn Smyth, were granted huge performance-based restricted stock awards, worth as much as approximately $13 million between the three of them. The Preliminary Proxy, at pages B-4, states the following in relevant part:

*2011 Performance-Contingent Restricted Stock Unit Program.* Effective August 31, 2011, Kaleil Isaza Tuzman, Gavin Campion and Robin Smyth were granted performance-contingent restricted stock units under our 2008 Incentive Stock Plan, as amended. The agreements provide that Messrs. Isaza Tuzman, Campion and Smyth will each receive the right to receive up to 636,000, 306,000 and 306,000 shares of our common stock, respectively. Other senior executives received a total of 425,000 similar restricted stock units, at the discretion of our Chief Executive Officer. The restricted stock units are subject to the applicable terms and conditions set forth in the 2008 Incentive Stock Plan.

The awards of performance-contingent restricted stock units are intended to provide an appropriate incentive structure for the executive management team of the company that is aligned with stockholder interests. The awards of these performance-contingent restricted stock units become payable based on a significant and sustained increase in the price of our common stock over the performance period, as described in greater detail below.

The vesting of the restricted stock units are generally determined based upon the common stock's highest 90-day volume weighted average stock price (the "90-Day VWAP") attained over a series of vesting periods (each such period is three months in duration) over the term of the agreement or, in the event of a change in control of the company, the fair market value of our common stock on the effective date of the change in control. For this purpose, the 90-Day VWAP means, as of any date, the ratio of the value traded (the common stock price multiplied by the number of shares of common stock traded) to total volume traded over the 90-day period ending on that date. In the event of a change in control of the company, the restricted stock units will vest based on the fair market value of the common stock on the effective date of the change in control.

Over the term of the agreement, up to two-thirds of the restricted stock units may vest and become payable if the highest 90-Day VWAP attained during any vesting period ending on an applicable vesting date (or in the event of a change in control of the Company, the fair market value of our common stock on the effective date of the change in control) is between $12.51 and $18.75. A proportionate amount of the remaining one-third of the restricted stock units will vest and become payable if the highest 90-Day VWAP attained during any vesting period ending on an applicable vesting date (or in the event of a change in control of the company, the fair market value of our common stock on the effective date of the change in control) is between $18.76 and $25.00. In either case, the percentage of the restricted stock units that may vest over the term of the agreement will be based on straight-line interpolation over either performance range. Thus, 0.1067% of the restricted stock units may vest and become payable for each $0.01 in which the highest 90-Day VWAP attained during any vesting period ending on an applicable vesting date (or in the event of a change in control of the company, the fair market value of our common stock on the effective date of the change in control) exceeds $12.50, but is under $18.76, and 0.0533% of the restricted stock units may vest and become payable for each $0.01 in which the highest 90-Day VWAP attained during any vesting period ending on an applicable vesting date (or in the event of a change in control of the company, the fair market value of our common stock on the effective date of the change in control) exceeds $18.75, up to $25.00 (at which point 100% of the restricted stock units become vested)

Ms. Meredith Deutsch
November 19, 2012
Page 3

This compensation structure provided Isaza Tuzman and the other executive officers with a huge incentive to inflate the stock price of the Company in order to be granted those restricted stock awards. The timing of the award is further evidence of Isaza Tuzman's desire to manipulate the stock price of the Company, as it came just over two months before Isaza Tuzman began making false and misleading statements concerning the Company's guidance. This evidence, in light of the dramatic changes that have occurred at the Company, causes considerable concern and raises questions about the adequacy of the internal controls at the Company. By ratifying these incentive awards, Isaza Tuzman had a perverse incentive to dramatically overstate the Company's guidance. Rather than providing "an appropriate incentive structure for the executive management team of the company that is aligned with stockholder interests," these restricted stock units motivated Isaza Tuzman to make unrealistic projections of the Company's business prospects so that he and the other KIT executives could personally benefit if they were able to artificially prop up the stock price.

We believe these facts demonstrate serious corporate malfeasance at the Company. Accordingly, we repeat our demands as set forth in our October 9, 2012 demand letter and supplement the information contained therein with that outlined in this letter. We would like you to provide certain information concerning the Audit Committee's investigation. First, please state who the current members of the Audit Committee are in light of the recent changes at the Board level. According to the Preliminary Proxy, the Audit Committee consists of Greg B. Petersen, William V. Russell and Wayne Walker. Second, given the fact that the Audit Committee has been authorized to investigate these matters, we believe it would be more prudent if the Audit Committee communicate directly with us rather than the Board, as they are in the best position to report on their findings. Third, please let us know if outside counsel has been appointed by the Board or the Audit Committee to aid in the investigation of these matters, and if so, please provide the firm and attorneys who are working with the Audit Committee.

Lastly, in your letter, you notified that the Board will respond to us "in due course." Please let us know when we should expect to hear from the Audit Committee on its findings. While we understand that a thorough investigation will take some time to conduct, it does not give carte blanche to defer our demand *sine die*. If you fail to respond with answers to my questions within 14 days of receipt of this letter that, we will be forced to assume that you have rejected our demand. We will then take whatever steps we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law. I look forward to hearing from you, and appreciate your prompt attention to this matter.

Sincerely,

Nicholas I. Porritt

Exhibit D



NEW YORK

KIT digital, Inc.
26 West 17th Street
2nd Floor
New York, NY 10011

December 10, 2012

VIA FEDERAL EXPRESS
AND TELECOPY (202) 333-2121

Nicholas I. Porritt, Esq.
Levi Korsinsky LLP
1101 30th Street, NW, Suite 115
Washington, DC 20007

       Re:    Demand Letter to the Board of Directors of KIT digital, Inc.

Dear Mr. Porritt:

     I am writing in response to your November 19, 2012 letter relating to your client's October 9, 2012 demand (the "Demand") on the Board of Directors of KIT digital, Inc. (the "Board"). The Audit Committee of the Board has engaged Jones Day to advise it with respect to the investigation it is leading into the matters raised in the Demand. If you have further questions relating to the investigation or the Demand at this stage, I suggest you contact Patricia Villareal of Jones Day at (214) 969-2973.

                    Very truly yours,

                    Meredith L. Deutsch
                    Acting Corporate Counsel

# Exhibit E

Levi **Korsinsky**~LLP~

Attorneys at Law

1101 30^th^ Street, N.W.
Suite 115
Washington, DC 20007
(202) 524-4290

Nicholas I. Porritt
nporritt@zlk.com

December 18, 2012

**VIA EMAIL**

Patricia J. Villareal
Jones Day LLP
2727 North Harwood Street
Dallas, Texas 75201
pjvillareal@jonesday.com

> ## Re:   *Demand Letter to the Board of Directors of KIT digital, Inc.*

Dear Ms. Villareal:

We refer to previous correspondence and write in response to the letter dated December 10, 2012 from Ms. Deutsch, Acting Corporate Counsel for KIT digital, Inc. ("KIT" or the "Company"). In her letter, Ms. Deutsch stated that the Audit Committee of the Board, absent Mr. Walker, has retained your firm to advise it with respect to the matters raised in our demand letter dated October 9, 2012, and additional supplemental demand letter dated November 19, 2012. The Board has had our demand for over two months and has only recently taken any steps to investigate our demand. We are concerned about this delay and expect the Audit Committee and your firm to move promptly and expediently to conclude its investigation.

We demand that the Audit Committee investigate all matters raised in our demands. In addition, on November 21, 2012, as you are aware, the Company filed a Form 12b-25 with the U.S. Securities and Exchange Commission ("SEC"), notifying that it discovered irregularities in the Company's financial statements "for (1) the years ended December 31, 2009, 2010 and 2011 and (2) each of the three quarters in 2009, 2010 and 2011 will be restated. As a result of the restatement of these prior periods, the Company will also restate the quarters ended March 31, 2012 and June 30, 2012." The filing goes on to state in relevant part:

> "[t]he accounting errors and irregularities relate primarily to recognition of revenue related to certain perpetual software license agreements entered into by the prior management team in 2010 and 2011. These errors and irregularities were discovered in connection with the Audit Committee's previously disclosed investigation of certain transactions that resulted in impairment charges. The Audit Committee has also determined that certain transactions entered into by the Company under the prior management team during fiscal years ended December

31, 2008 through 2011 were related party transactions and that additional disclosure with respect to those transactions should have been included in the footnotes to the relevant financial statements. Because of the timing of the completion of the Audit Committee investigation and the Company's ongoing review and investigation of certain transactions, the Company requires additional time to complete an analysis of the accounting treatment for the software licenses and to determine the extent of the corrections that may be required to its historical financial statements. Other effects on previous financial statements are also possible. Accordingly, the Company cannot currently quantify the potential impact of the restatement. Therefore, the Company is unable to timely file its Current Report on Form 10-Q for the three months ended September 30, 2012."

We believe these facts overwhelmingly demonstrate serious corporate malfeasance at the Company, particularly in connection with the equally serious allegation of inflated projections coupled with performance-based restricted stock awards tied to the stock achieving certain milestones. A securities class action lawsuit has also been filed as a result of this restatement, further tarnishing the image of the Company and forcing it to spend resources defending these additional allegations. Accordingly, we repeat our demands as set forth in our October 9, 2012 demand letter and our November 19, 2012 letter, and supplement the information contained therein with that outlined in this letter.

We note that our demand has been outstanding for over two months, and the Company has not addressed what steps are being taken to remedy the situation. The Audit Committee has already stated its findings that the financials for the Company since 2009 cannot be relied upon, which lends credence to the arguments in our initial demand that the projections were improperly made. Therefore, it is incumbent on the present Board to take up our client's demand and litigate against the Company to pursue these allegations on behalf of the Company in order to implement reforms, ensuring that these misdeeds will not occur in the future, and clawback executive compensation paid out to the executive officers. Please respond to us within 21 days, advising the steps the Audit Committee is taking to investigate these serious matters and when it expects to respond to our demand. Undue delay shall be deemed a rejection of the demand.

Sincerely,

Nicholas I. Porritt

## **VERIFICATION**

I, Marek Vasut, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: February___, 2013

Marek Vasut